Wanamaker, J.,
dissenting. In my dissenting opinion in the Celina & Mercer County Telephone Company case, ante, 506, I gave my reasons for holding that the judgment in that case violated the public utility statute, especially the jurisdiction, as defined by Sections 614-2a and 614-8, which sections expressly and explicitly excluded the defendant company from the jurisdiction of the commission. The same holding applies in this case.
But this judgment, in addition to violating the public utility statute, likewise violates the people’s constitution in many respects, two of which are so notable that I shall define and discuss them at length.
First. I shall here consider the more general provisions of the state and federal constitutions, dealing especially with liberty to acquire and possess property, involving generally the liberty to contract as declared in the federal constitution, especially the 14th Amendment thereto, and the same liberty, together with the “equal protection and benefit” of the laws, as written into the Ohio Constitution. The crux of this controversy grows from Section 614-52 of the public utility act, that part of it which reads:
“No telephone company shall exercise any permit, right, license or franchise * * * in any municipality or locality, where there is in operation a telephone company furnishing adequate service, *537 unless such telephone company first secures from the commission a certificate/’ etc.
I hold that this section permits, promotes, and protects a telephone monopoly in favor of the occupying telephone company, and that such monopoly is contrary to our American institutions, public policies and constitutions, as declared and defined in the foregoing provisions of the state and federal constitutions.
The distinctive American doctrine of “equal protection of the laws,” as expressed in the 14th Amendment of the Federal Constitution and incorporated in practically all the state constitutions, in substance, is really the keystone of American democracy. Indeed it was in the very warp and woof of our American institutions before we had constitutions, and it is made the very bedrock of the Declaration of Independence.
Sometimes this doctrine is put in the phrase, “Equal rights to all, and special privileges to none.” It is in short the doctrine of equality before the law; equality in rights; equality in opportunity.
Lincoln in one of his immortal messages to congress, said among other things, that “The leading object [of government] is to elevate the condition of men — to lift artificial weights from all shoulders; to clear the paths of laudable pursuit for all; to afford all an unfettered start, and a fair chance in the race of life.”
■ Not much monopoly in this.
This is the plain phrase of the people put into their organic law and interpreted by their Jeffersons, their Lincolns, and their Roosevelts.
*538 I care not what some court decisions may hold about it, no infamy is too infamous that some decisions of some court somewhere cannot be found to support it; even witchcraft and slavery were defended by some very plausible opinions. But the language of the constitution is not the language of a court, and must not be considered from the angle of the professional mind, from the viewpoint of legalism, or the squint of a technical judge.
John Marshall announced the true doctrine when he said in Gibbons v. Ogden, 9 Wheat. (22 U. S.), at page 188:
“As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.”
This language of the people in the constitution, “equal protection of the laws,” supplemented by the people’s epigram, “equal rights to all; special privileges to none,” with the interpretation of it given by Lincoln in the above quotation, must stand as the light-houses to this language as used by the people in their political will, their sovereign constitution.
The Ohio Constitution,- dealing with this same doctrine, uses this language in its bill of rights, Section 1, Article I:
“All men * * * have certain unalienable rights, among which are those of enjoying and de *539 fending life and liberty, acquiring, possessing, and protecting property,” etc.
Section 2 of the same article reads:
“Government is instituted for their equal protection and benefit
Monopoly, whether of wealth, power, business, or what not, has always been most odious and reprehensible to our American people and their democratic institutions. Very glowing eulogies, some by courts, have been pronounced in behalf of certain monopolies, included among which have been telephone companies. If these, or any other monopolies, are benevolent in their character, let the people who are to be served by them and pay for them determine whether or not they want them, and the terms and conditions upon which the service is to be rendered.
But I do most earnestly protest against the right of anybody, board or commission, unrepresentative of the people and irresponsible to the people, to impose any such monopoly, under the guise of a statute, upon the people of any municipality of the state of Ohio against their will.
It is un-American and unconstitutional, and contrary to all our public policies, which declare against restraint of trade and suppression of competition. Our national policy in that behalf is best expressed in the Sherman Anti-Trust Law, and our state policy in the Valentine Anti-Trust Law.
Monopoly, of any kind whatever, is, after all, only another form of autocracy. We helped to fight that doctrine to death abroad. Why should we coddle it at home ?
*540 Section 614-52, General Code, which is the one here and now in question, undertakes to vest in the Public Utilities Commission the power to suppress and stifle all competition in telephone service; the power to give the present occupying company a monopoly of that service. The commission is not only authorized so to do, but directed so to do where the present service is “adequate,” that is, sufficient to the public needs. The section makes no reference to reasonableness of price or the terms and conditions of the franchise. It is purely a question under the statute of adequacy of service.
This commission that undertakes to impose and fasten monopoly upon the people of the municipalities of the state, three million of them, is a body of three men, however eminent, unchosen by the people, unresponsible to the people, whose acts and powers are unreviewable by the people, which is a direct violation of the rights of representative government, but a greater violation is its denial to the people of the city of their constitutional right of referendum on all matters of local self-government that are legislative in character.
These constitutional provisions are absolutely wiped out by this rule, as if by fire or flood. True, it is indirectly done, but that makes no difference. What the legislature or commission cannot do directly, it cannot do indirectly.
In Taylor v. Commissioners of Ross County, 23 Ohio St., 22, the syllabus reads: “What the general assembly is thus prohibited from doing directly, it has no power to do indirectly.”
*541 What does the Federal Constitution, especially the 14th Amendment, mean by “equal protectior of the law,” as guaranteed to the citizens ? What does the Ohio Constitution mean by “common protection and benefit of the law” in its bill of rights ?
OHIO CASES CONSTRUE THESE TERMS CONTRARY TO THIS JUDGMENT,
These questions are very largely unanswered and undiscussed in the majority opinion. The opinion does cite some cases on the subject of classification, but this case does not involve a question of mere classification, but rather a question of discrimination, for the favoring of one class and one class only, which is the present occupying utility.
The only Ohio case cited upon the subject of discrimination, in support of the majority opinion, is cited in the Celina & Mercer County Telephone Company case. It is the case of Palmer & Crawford v. Tingle, 55 Ohio St., 423.
The majority opinion in the Celina case merely quotes the syllabus, as follows:
“The inalienable right of enjoying liberty and acquiring property, guaranteed by the first section of the bill of rights of the constitution, embraces the right to be free in the enjoyment of our faculties, subject only to such restraints as are necessary for the common welfare.
“Liberty to acquire property by contract, can be restrained by the general assembly only so far as such restraint is for the common welfare and equal protection and benefit of the people, and such re *542 straining statute must be of such character that a court may see that it is for such general welfare, protection, and benefit. The judgment of the general assembly in such cases is not conclusive.”
I most heartily endorse this doctrine. But it is violated in every line and in every angle of these two telephone cases. The judgment in these cases not only violates “liberty,” and denies the right of “acquiring property” and “the right to be free in the enjoyment of our faculties,” subject only to such restraints as are necessary for the common welfare, but it undertakes to legislate, not for the common welfare, but for the promotion of a telephone monopoly, and denies the “liberty to acquire property by contract,” and “the equal protection and benefit of the people,” quoting from the syllabus of the case last cited.
In the opinion in the case of Palmer v. Tingle, which was evidently overlooked by the majority, the following language appears at page 444:
“It is also urged by the friends of the statute, that it is beneficial in this, that it drives all the small and insolvent contractors out of business, and leaves the contracting business in the hands of those who are rich enough to guarantee their contracts. But it is not for the general welfare that small and financially weak contractors should be driven out of business. As well might poor laborers and small furnishers be driven out of business, and thus leave the whole business of building and furnishing to the rich, and give them a monopoly of the whole trade, and drive the weak and poor into starvation.
*543 “And it is a narrow, unworthy, and unpatriotic policy, to attempt to drive the poor and weak out of business for the benefit of the rich and influential. One of the principal virtues of the statute claimed by its friends, is, that it has driven all of the poor and weak contractors out of business. This result instead of being commended, is to be deplored.”
How can this reasoning on the principle of discrimination, and the application of the principle, be squared with the majority opinion? Both cannot be sound.
This principle was considered by our supreme court in State v. Gardner, 58 Ohio St., 599. This was another case of discrimination. In the Tingle case, just quoted, the discrimination was between the rich and the poor contractors. In the Gardner case it is between the individual plumber and the corporation engaged in plumbing, getting very close to the case we have at bar. The syllabus of the Gardner case reads:
“1. The right to labor and enjoy the rewards thereof is a natural right which may not be unreasonably interfered with by legislation. * * *
“3. But it is essential to the validity of an act undertaking to regulate the business, that it shall, in its requirements, operate equally.”
I happen to have been prosecuting attorney of Summit county when that case was tried, and stood for the validity of the act, as it was my duty to do, until the court of last resort declared otherwise. I there made the same contentions as here made by the majority opinion, that there was no discrimina *544 tion, contrary to the 14th Amendment or to the Ohio bill of rights, that there was no denial of the equal protection of the law, or of the common protection and benefit of the law. The court thoroughly overwhelmed me in my contentions, and soundly held that the discrimination against the individual plumber in favor of the corporation plumbing company was a direct violation of these constitutional guaranties.
In the opinion of the supreme court, by Chief Justice Spear, the following appears, at page 609:
“But a graver objection inheres in the claim that the act imposes unequal burdens upon those of the same class. * * * That is, a journeyman, for whomever he works, must have a license, and an employing plumber, if not a member of a firm or a corporation, may not pursue the calling without a license. But a master or employing plumber if he be a member of a firm another member of which has procured a license, is exempt, although he may be one who has, as a journeyman, applied for a license and failed for incompetency. .So, too, in case of a corporation, if the manager is licensed, other members of the corporation may work without a license, without reference to their competency.”
The opinion concludes as follows:
“A statute, therefore, which imposes special restrictions or burdens, or grants special privileges to persons engaged in the same business under the same circumstances, cannot be sustained, because it is in contravention of the equal right which all are entitled to in the enforcement of laws and in the enjoyment of liberty, and in. the enjoyment of an equal *545 right in the acquisition and possession of property, and so is not of uniform operation.”
But we still have a later and stronger case squarely in point by our supreme court, which deals not only with discrimination in favor of a corporation, but discrimination in favor of a corporation that amounts to a monopoly. It is State, ex rel. McKell, v. Robins, 71 Ohio St., 273. This case involved the constitutionality of an act of the general assembly passed in 1904, relating to the giving of “surety bonds.” As recited in the opinion, at page 290, the act provides:
“That the execution of all bonds for the faithful performance of official or fiduciary duties, or the faithful keeping, applying or accounting for funds or property, or for one or more of such purposes, with certain exceptions, is thereby required to be by a surety company or companies.”
Here it will be seen that these surety companies were to have a monopoly of the bonding of all official or fiduciary persons, where a bond was required. In short, such persons were denied the privilege of securing personal bondsmen. The direct and single issue in this case was as to the constitutionality of the act, in that it was claimed to violate these same fundamental principles of the 14th Amendment of our federal constitution and the Ohio bill of rights.
Judge Davis in his opinion holding the act unconstitutional, said, at page 290:
“Liberty to contract is one of the inalienable rights of man which is guaranteed to every citizen *546 by the bill of rights (Constitution, Article 1, section 1) subject only to such restrictions as clearly appear to be for the general welfare. The mere fact that the general assembly has enacted a law which narrows the liberty of contract as to the whole people or as to a class of citizens, is not decisive. If it were so, the constitutional guaranty might be made a dead letter by bills passed through the procurement of interested parties or in response to the demands of extremists in times of popular excitement. It is the province of the courts to determine whether a given statute infringes the constitution, which is the supreme law; and therefore it is within the province of the courts to decide whether the common welfare demands a restriction of the right of individuals to contract freely for their own benefit or convenience.”
■ Again, Judge Davis says, at page 291:
“Before the enactment of this statute an officer was at liberty to present a bond signed by personal sureties Or by a surety company or companies, as his own interests or convenience might suggest. The right of choice between the classes of sureties is now denied him. It is now made compulsory upon him to give bond signed by surety companies, and personal security is in effect abolished. It is very plain that the security companies may be greatly benefited by this legislation, but an adequate corresponding benefit or protection to the general public, such as would justify such a radical and drastic limitation Upon individual rights, is not apparent.”
In the Tingle case, supra, our supreme court holds unconstitutional the statute involved, as con *547 stituting an unjust discrimination, an unequal and special privilege, contrary to our Ohio constitution, and contrary to the judgments in these telephone cases.
In the Gardner case, supra, where the Tingle case principle is applied and extended, our own supreme court again holds the discrimination unfair, special and unequal, as provided by the statute, and therefore holds the statute unconstitutional, contrary to the.judgments in these.telephone cases.
In the Robins case, supra, we again have this principle extended and applied to a corporation monopoly, identically as it is in the telephone cases, but in the Robins case the supreme court of Ohio again holds the statute unconstitutional as in violation of the equal protection of the law and the common protection and benefit of the law as required by our federal and state bill of rights, all contrary to the judgments in these telephone cases.
My experience upon the bench has taught me that precedents are followed when they square with the judgment desired to be rendered. They can with equal fidelity be ignored when they do not square with the judgment desired to be rendered.
The decisions cited in the majority opinion from Wisconsin, Idaho and Indiana, are all by divided courts, all under different constitutional provisions, and are merely “thus saith the courts” instead of conclusions reinforced by clear and convincing reason. Our Ohio courts, as appears from the foregoing cases, hold squarely and repeatedly to the contrary.

*548
I candidly confess to a most decisive preference for the decisions and doctrines announced by our own supreme court, extending over a long period of years, where they are squarely and directly in point, and fortified by sound reasons therefor, rather than for the decisions of the courts of other states, under other constitutions, bound by other precedents, bearing only a remote, if any, analogy to our own. Our oath makes it our primary duty to support our own constitution, according to the best of our own understanding and ability, with a decent regard for our own courfs past interpretations and applications of it.

Let me illustrate denial of the “common protection and benefit of the law,” as used in the Ohio Constitution, or the expression “equal protection of the laws,” as used in the Federal Constitution, which phrases are not only synonymous, but identical in meaning, by forgetting the corporation for a moment and dealing with individuals only.
I fear we sometimes forget that our American constitutions were written and adopted, as the Declaration of Independence said: “To secure these rights [unalienable rights of men], Governments are instituted among Men.” Too many courts have been amending that old-time fundamental declaration by undertaking to make it read, “To secure these rights [unalienable rights of corporations], Governments are instituted among Men.” Let us put man in his rightful place in both constitutional and statutory law, and see where we are at.
*549 Now, suppose some individual is given, through some board or commission of legislative creation, jurisdiction and power, sole and exclusive authority, to exercise some business right or privilege in a certain community, and either expressly or impliedly those same rights are denied to other citizens. Would there be any question but that such grant of power or privilege by such board or commission to one or more citizens, under whatever style or name, to the exclusion of all other citizens in that community, would be unconstitutional, under both our national and state constitutions ?
Suppose we multiply that one individual against all other citizens, by ten or twenty. Merely because there is a difference in numbers, would that make any difference in principle?
Again, suppose that body of ten or twenty citizens should sink their personal identity, and incorporate under the laws of the state. Has that corporation acquired any rights under the constitution, in power or privilege of monopoly, that the individual citizens who incorporated it did not have?
I admit that there are a considerable number of exceedingly influential citizens who think that in the business or political world a corporation has some special privileges that the individual has not, but I have never so conceived the relative importance of the natural and artificial person in the great scheme of government, and I protest against this conferring upon a mere artificial creature, brought into being by the people’s law, power which is expressly denied to the people themselves, as unjust, unfair, unlawful and unconstitutional, by *550 reason of its being a discrimination, a monopoly of those rights, powers, and privileges that should be equal under the law.
Second. The present violation of the constitu-. tion relates to the new order, under the new constitution, and is more specific, violating directly Article XVIII of the Ohio Constitution, dealing with municipal corporations, their rights and powers.
The 18th Amendment was submitted by the constitutional convention to the people of Ohio for their adoption or rejection, under the simple heading, “Municipal Home Rule.”
Section 3 of that amendment, as set forth in the words, “municipalities, shall have the authority to exercise alL powers of local self-government,” is the first instance in which the sovereign people of Ohio had expressly granted ho the 'sovereign people of the municipalities the sovereign right of Home Rule, or “all powers of local self-government.”
This was a new and radical departure from what had been the constitutional history of Ohio. Theretofore, the municipalities of the state had gotten their power piecemeal from the legislature. One general assembly would grant it; the next general assembly would take it away; and the municipalities of the state were made the footballs of the political bosses and the big interests.
The sovereign people of Ohio finally decided to set this whole subject at rest, and determined to settle this exercise of power, not by statute, but by constitutional grant, and Article XVIII was framed and adopted for that special purpose.
*551 In addition to the general grant made by the sovereign people of Ohio to the sovereign people of the municipalities, in Section 3, Article XVIII, that municipalities shall have authority to exercise all powers of local self-government, the same sovereign people of the state granted to the same sovereign people of the municipalities, in Sections 4 and 5, the power to contract for the product or service of any public utility.
I hold that the constitution’s grant in Section 3, “all powers of local self-government,” and the more specific grant in Sections 4 and 5, “power to contract for the product or service of any public utility,” being express grants, are in and of themselves exclusive grants. That is, a constitutional grant by the sovereign people of the state expressly and explicitly made has been repeatedly held by this court to be an exclusive grant of power free from all legislative interference either to add to, subtract from, or in any wise impair or limit.
OHIO CASES HOLDING EXPRESS GRANTS IN ARTICLE XVIII EXCLUSIVE GRANTS, FREE FROM LEGISLATIVE INTERFERENCE.
In City of Zanesville v. Zanesville Telegraph & Telephone Co., 64 Ohio St., 67, it is held in the syllabus: “The distribution of the powers of the state, by the constitution, to the legislative, executive, and judicial departments, operates, by implication, as an inhibition against the imposition upon either, of those powers which distinctively belong to one of the other departments.”
*552 Our own supreme court, therefore, has held that this express grant to one department is exclusive and a denial of a right to exercise the power included in that grant by any other department.
The same doctrine is held in Incorporated Village of Fairview v. Giffee, 73 Ohio St., 183. The syllabus in point reads: “Under the constitution of this state the power of defining the functions of the judicial department is only limited by the general rule that the grant of general powers to any department constitutes of itself an implied exclusion of all other departments from the exercise of such powers.” Citing the Zanesville case.
If this doctrine be sound as to a delegation to a department of the state, it surely is likewise sound when applied to any delegation to a division of the state, such as a township, a county, a city or a district.
In Cincinnati Polyclinic v. Balch, 92 Ohio St., 415, decided in 1915, it was held that the general assembly “has no power to enlarge or limit the jurisdiction conferred by the constitution of the state, but may provide by law for the method of exercising that jurisdiction.”
That same doctrine is announced in Wagner v. Armstrong, 93 Ohio St., 443, decided in the following year, and by a unanimous court.
True, the syllabus in the Polyclinic case, supra, uses the word “jurisdiction” and not the word “power.” But jurisdiction implies power and power implies jurisdiction. In short, both deal with authority to act. These two words are used inter *553 changeably, jurisdiction having more particular reference to the exercise of judicial power, while the word power is more frequently used in the sense of political power through political agencies, though both words are used in connection with various boards and commissions exercising both administrative and quasi-judicial powers, as for instance the Public Utilities Commission whose power is herein questioned.
These four cases, unless they are meaningless, clearly and conclusively decide that an express grant of jurisdiction or power to one department or division of the state is an exclusive grant free from any and all legislative interference, impairment or limitation.
This same doctrine that an express grant is an exclusive grant, or that an express exercise of power in the constitution is an exclusive right to exercise such power upon that subject-matter, is more fully discussed in the recent case of Fulton v. Smith, 99 Ohio St., 230, decided February 14, 1919.
It may be said that these various cases in no wise affect Article XVIII, dealing with municipalities. Yet the principle is identical. That is, in the cases cited we have an express grant of power directly delegated by the sovereign people to certain departments or divisions of the state, and these decisions by our supreme court uniformly hold that such grant of power is exclusive, free from legislative interference, and it cannot be any less so when that grant of power is to a municipality.
But we have a case directly in point very recently decided touching municipalities.
*554 In City of Elyria v. Vandemark, 100 Ohio St., 365, Section 1, Article XVIII, was under review touching the right and power of the general assembly to classify cities. There it is held: “The constitution of the state [Section 1, Article XVIII] having classified municipalities on a basis of population, the legislature is without authority to make further classification thereof for the purpose of legislation affecting municipal government.” •
Judge Matthias, in his opinion in that case, at page 371, further says: “It is to be observed that the constitutional convention not only did not confer any power whatever upon the legislature to make any classification of municipalities, but it denied the legislature such authority by retaining and exercising that jurisdiction itself.”
Judge Matthias continues in support of that doctrine, as follows: “It [the constitution] thereby withheld that subject absolutely and entirely from legislative- control and permitted it to be no longer a matter of statutory jurisdiction. - The general assembly has no power to enlarge or limit a jurisdiction specifically conferred by the constitution.”
The judgment in City of Elyria v. Vandemark is concurred in by all the judges participating in the case. Matthias, J., who wrote the opinion, Nichols, C. J., Jones, Johnson, Wanamaker and Robinson, JJ., concur.
This judgment and opinion recognize the new order of municipal government in Ohio under Article XVIII, the Home Rule Amendment adopted in 1912. It expressly and unanimously holds the withdrawal of the old order and the old power *555 from the legislature, not only as to classification, but in the language of the opinion, as to the whole matter of municipal government.
The opinion at page 371 reads:
“The constitutional convention retained the provision that ‘General laws shall be passed to provide for the government of cities and villages,’ substantially as in the former constitution, but in furtherance of its manifest and clearly expressed purpose to take from the legislature the power theretofore exercised by it relative to the government of the municipalities of the state and to confer such powers of local self-government directly upon the municipalities themselves the constitution provides in Section 1, Article XVIII, that ‘Municipal corporations are hereby classified into cities and villages.’ ”
Here is a clear and conclusive admission of the purpose of Article XVIII to withdraw from the legislature the old-time guardianship it had exercised over municipalities, and to place such right of “local self-government in the hands of the municipalities themselves.'”
It is a recognition of the doctrine of “immunity” as laid down and discussed in the parent case on Home Rule, State, ex rel. City of Toledo, v. Lynch, Auditor, 88 Ohio St., 71. In that case Judge Shauck said, at page 93:
“This article- [Article XVIII] provides two modes of securing the permitted immunity from the operation of the uniform laws which the legislature is required to pass. One of them is defined in the second section, and manifestly it is not self-executing, for it expressly authorizes the legislature to *556 pass ‘additional laws/ that is, laws additional to the general laws which the legislature is required to pass * * * The other mode is defined in the provisions of the later sections relating to the adoption of charters.”
Instead of using the word “immunity” from general laws or legislative action, Judge Matthias in the Elyria case uses this language:
“It is to be observed that the constitutional convention not only did not confer any power whatever upon the legislature to make any classification of municipalities, but it denied the legislature such authority by retaining and exercising that jurisdiction itself. It thereby withheld that subject absolutely and entirely from legislative control and permitted it to be no longer a matter of statutory jurisdiction. The general assembly has no power to enlarge or limit a jurisdiction specifically conferred by the constitution.”
Section 3, Article XVIII, in conferring jurisdiction upon municipalities to “exercise all powers of local self-government,” “denied the legislature such authority,” or “withheld” that subject absolutely and entirely from legislative control.
This is no less true as to Sections 4, 5 and 6, that deal with public utilities.
The previous year, 1911, the general assembly had taken general jurisdiction of all public utilities, especially the fixing of rates, by creating a Public Service Commission, as it was then known, which later became the Public Utilities Commission, and had defined its jurisdiction and conferred upon it certain powers. As a part of that power, Section *557 614-52 was enacted, the basis of which, or the “pole-star” of which, is the last line of that section, that the “exercising of such license, permit, right or franchise” of a telephone company of any municipality or locality is “proper and necessary for the public convenience.”
Up to the time of the adoption of the municipal Home Rule Amendment, Article XVIII, the question as to what was “proper and necessary for the public convenience” in “any municipality or locality” was a matter for the state to determine through its then Public Service Commission.
By the doctrine announced and applied in the Elyria case that power was “withheld” from the general assembly, its boards or commissions, and vested in the municipality: first, under the general power of “local self-government,” in Section 3 of Article XVIII, and, second, under the “power to contract for the product or service,” expressly granted by Sections 4 and 5 of Article XVIII.
The principle of withholding or withdrawing from the general assembly that applies to Section 1, Article XVIII, must likewise be held to withhold or withdraw the power delegated in Sections 3, 4 and 5 of said Article XVIII.
This is especially true when we come to consider the general effect of Article XVIII, and the address to the voters of Ohio touching that article, which no doubt had controlling force in its adoption. The heading of that article when submitted to the voters included a declaration that said article gave the municipalities “the power to own and regulate their own public utilities”
*558 Surely the people were the best judges of whether or not a public utility should be owned and operated by the municipality, or should only be “regulated” .by the municipality.
This brings me back to Judge Shauck’s opinion in the Lynch case, supra, touching the. powers of local self-government, in which he says, at page 97:
“They [all powers of local self-government] are such powers of government as, in view of their nature and the field of their operation, are local and municipal in character. The force of the terms employed requires the inclusion of such pozvers to be exercised by officials who in some manner and to some extent represent the sovereignty of the people.”
In Allion v. City of Toledo, 99 Ohio St., 416, the same doctrine of leaving the public convenience in any municipality or locality to the local authorities is expressly and unanimously approved. The syllabus includes this language:
“Local authorities are presumed to be familiar with local conditions, and to know the needs of the community.”
Judge Jones in the opinion, at page'420, says:
“The local authorities acquainted with local conditions are presumed to know what the needs of the community demand.”
He quotes with approval the following from Schmidinger v. City of Chicago, 226 U. S., 578:
“Local legislative authorities, and not the courts, are primarily the judges of the necessities of local situations calling for police regulation, and the ■ courts can only interfere when such regulation *559 arbitrarily exceeds a reasonable exercise of authority.”
This doctrine was laid down' in connection with the fixing of the size of a standard loaf of bread.
I maintain that if it is a sound doctrine in fixing “standard size of bread loaves,” it is equally sound doctrine in fixing a fair fare for telephone rates of service.
Under the new order, the 18th Amendment withdrew, or withheld, which is the word used in the Elyria case, the subject of public utilities, their ownership, operation and regulation within the municipality from the state at large, as provided in the public utilities act of 1911, and also created a new judge of what is “proper and necessary for the public convenience.” It is no- longer the “state,” through the commission, but the people of the municipalities, first, through their council, second, by their referendum on the action of council. This new order was constitutionally fixed by Sections 3, 4 and 5 of Article XVIII, and neither the old statute of 1911 nor any new statute may interfere with it.
In the majority opinion in this case it is further said touching such contract:
“And such a contract the municipality may make under this direct power granted in the constitution. That the power thus given is self-executing, this court has several times held. In Dravo-Doyle Co. v. Village of Orrville, 93 Ohio St., 236, the law is definitely stated in syllabus 1:
“ 'Section 4, Article XVIII of the Constitution, confers plenary power on “any municipality” to *560 acquire, construct, own, lease and operate any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and to contract with others for any such product or service/ ”
State, ex rel. City of Toledo, v. Lynch, Auditor, 88 Ohio St., 71, and State, ex rel. Campbell, Pros. Atty., v. Cincinnati Street Ry. Co., 97 Ohio St., 283, are also cited.
If now the constitution had conferred upon the municipality “plenary power,” as decided in the Dravo-Doyle case, supra, and approved in the majority opinion, then how can that plenary power be in any wise impaired or limited by the legislature by vitiating and nullifying the contract or its operation under the contract that the Village of New Washington has made with the defendant company in this case ?
The majority opinion goes on to say:
“To constitute a valid contract, there must be parties capable to contract, a lawful subject-matter, a sufficient consideration, and an actual agreement to do or forbear from doing some particular thing/’
This, after all, is only elementary, and therefore not subject to any debate.
The opinion continues:
“Again, to constitute a contract, there must be parties capable to contract. Here we meet the difficulty.
“The village is. given the direct power in the Home Rule Amendment to contract ‘with others’ for product or service. No question can arise here, *561 as often did 'before the amendment became effective, as often nearly as a case arose, as to the authority of the municipality to contract and whether or not in so doing the act of the municipality was ultra vires unless it was definitely shown that the legislature had specifically delegated the power in no uncertain terms. Here the power to contract with others is clear, positive and direct. The question, then arises, with what others, with whom? Certainly with any person, corporation or other legal entity capable to contract, and just as certainly not with one who did not possess the power or authority to contract, — not from considerations arising by way of limitations upon the municipality, but from considerations going directly to the effectiveness, enforceability and legality of the contract itself.”
The majority opinion declares:
1. That under the Dravo Doyle case, supra, the Village of New Washington had the “plenary power,” as held in that case, to contract for the product or service of telephone communication.'
2. That the defendant mutual company is not qualified to contract by reason of not having obtained a certificate of necessity under Section 614-52.
3. That therefore by reason of the defendant mutual company being unqualified, or not having yet been rendered capable of contract as a telephone company by the Public Utilities Commission under Section 614-52, any contract so made by the municipality with the mutual company would be in *562 valid; or if it has the naked right to contract it has no power to perform under such contract.
Then follows the conclusion in the majority opinion :
“The defendant, therefore, by its failure to possess a certificate is under a legal infirmity, without which it is incapable of contracting for the furnishing of telephone service. * * * This want of a certificate on the part of a public utility desiring to contract for the furnishing of telephone service is the same as lacking the certificate or badge of authority to enter into a contract to furnish the service. This, however, in no zvay limits the power of the municipality. It is not even a party to the litigation.”'
I hold that under the cases cited, and the course of reasoning employed by them, and resulting from them, the general assembly by reason of the 18th Amendment to the Ohio Constitution, and the several sections thereof, has no power to deal with matters “of local self-government.” This is purely a municipal matter.
I hold that this conclusion is a denial of the liberty of contract as declared and defined by the supreme court of the United States in many adjudicated cases, and further as declared and defined by the 4th and 5th sections of Article XVIII of the Ohio Constitution.
I hold also that this conclusion of the majority opinion, that “this in no way limits the power of the municipality,” is false and illogical upon its face, is unreasonable and unconstitutional in its opera *563 tion, and does “limit the power of the municipality” by preventing it from contracting with any new company and compelling it to contract with the old telephone company occupying the field or not to contract at all.
What do we mean by liberty of contract? The supreme court of the United States has repeatedly passed on this question. In Northern Securities Co. v. United States, 193 U. S., 197, it is held, among other things:
“Liberty of contract did not involve a right to deprive the public of the advantages of free competition in trade and commerce. Liberty of contract does not imply liberty in a corporation or individuals to defy the national will, when legally expressed.”
In the much-quoted case of Allgeyer v. Louisiana, 165 U. S., 578, the supreme court of the United States passed upon this question. Justice Peckham, speaking for the court, said at page 589, touching the 14th Amendment of the Federal Constitution:
“The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to e'arn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned.”
*564 Justice Peckham, at page 589, also quotes with approval Justice Bradley in Butchers’ Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co., 111 U. S., 746, 762, as follows:
“ ‘The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase “pursuit of happiness” in the Declaration of Independence, which commenced with the fundamental proposition that “all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.” This right is a large ingredient in the civil liberty of the citizen.’ Again, on page 764, the learned justice said: T hold that the liberty of pursuit — the right to follow any of the ordinary call-' ings of life — is one of the privileges of a citizen of the United States.’ And again, on page 765: ‘But it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen.’ ”
Justice Peckham concluded as follows:
“It is true that these remarks were made in regard to questions of monopoly, but they well describe the rights which are covered by the word ‘liberty as contained in the fourteenth Amendment."
*565 This federal case is squarely in point and demonstrates beyond the peradventure of a doubt the unsoundness of the judgments in these telephone cases.
I want to make another observation as to this liberty of contract, dealing with some of the elements of it, in addition to what has been said in the cases cited. While by Section 614-52 the municipality may be compelled by the action of the commission to contract with the occupying company, the plaintiffs in error, the majority opinion says such compulsion “in no way limits the power of the municipality.” This is a candid, cold-blooded statement of a most vicious principle, but one that is absolutely necessary to sustain this judgment.
Put in other words it means this, that the liberty of contract given by Sections 4 and 5, expressly and exclusively given by said sections to the municipality, is in fact not given to them at all, though the majority-opinion admits they have “plenary power” so to contract. In practical operation, that liberty of contract, the majority hold, is given finally to the Public Utilities Commission; that the statute in this case is paramount to the constitution. It is almost unbelievable.
The power to contract must necessarily involve all the elements of contract; and that liberty in the exercise of that plenary power, as is admitted by the majority, must include the following:
1st: The subject-matter of the contract. What product or service does the municipality desire to obtain by the contract ?
2d: The other party to the contract. Will it be held that you can have liberty of contract when *566 there is denied either party to the contract the right to choose who the■ other contracting party shall be? Was ever liberty declared in terms of tyranny more absolute?
3d: Another element included within a contract is necessarily the right to fix the terms and conditions under which the contract relation shall exist — the occupation and use of the streets, alleys and public ways of the municipality, and the care thereof.
4th: It surely likewise must include the financial consideration; the kind of service to be rendered; and the rates or prices which the municipality and its inhabitants shall pay. Will it be held that these things are not a part of the consideration for the contract, essential to make it a contract, as much so as when the contracting parties are merely individuals ? Will it be held that fixing rates for that service is not also a part of the necessary terms and conditions of such contract? The mere fact that you call it fixing rates does not change the power involved in “making a contract.” This same thing is done when the rate of interest is fixed in a note; it is done when the consideration, time and terms of payment are fixed in a building contract. It is done in every lease, mortgage, and the like. We must not permit ourselves to be misled or confused by the names of things. It. is the nature, the inherent and essential character of the thing that counts.
Many more elements of contract might be mentioned, but it is unnecessary here in the consideration of this case. When any of these elements of a contract are in any wise interfered with, anywise *567 added to or subtracted from, limited or denied to the municipality, how in the name of common sense, common conscience, and common honor can any court say that the general assembly, either by itself or by some board or commission created by it, may destroy in whole or in part, or in any wise limit, that constitutional power by any statutory grant? It is unthinkable.
The liberty of contract which the majority hold is not impaired by Section 614-52 reminds me of the liberty extended by the bandit to his victim, when the latter was commanded at the point .of a gun, “Throw up your hands or I will kill you; by refusing, you become your own murderer.” The victim had a liberty, and so has the municipality.
Whither Are We Tending? Within the past sixty days this court in three notable cases has denied to the people their clear constitutional rights, to the great pleasure and profit of the great corporate interests of the state. I shall give some particulars :
1. It has denied to the people of the cities and villages of the state, three million or more of them, their constitutional right of Home Rule, or the powers of local self-government, expressly and excluively given by the sovereign people of the state to the sovereign people of the municipalities by virtue of the 18th Article of the Ohio Constitution adopted in 1912; also denying to the people their right to representation in government as well as their right to a referendum in fixing public utility rates. See *568 City of Cleveland v. Public Utilities Commission, ante, 341.
If taxation without representation was un-American in colonial days, what will be said of taxation, not only without representation, but without the constitutional right of referendum, in this, the 20th century? The battle for this principle in colonial days was fought and finally won. The battle for this principle in the 20th century has only begun.
2. It has denied to the great industrial army of working men, working women, and working children, in the factories, mines, etc., the right to the full protection also given and guaranteed by Sections 34 and 35 of the Constitution adopted in 1912, and has successfully undermined this fundamental conservation policy therein defined and granted, which power said Section 34 expressly provides no other provision of the constitution shall “impair or limit.” I take it that that is obligatory upon the court, although the word court does not expressly appear in this language. See Patten v. Aluminum Castings Co., decided by this court, June 14, 1921.
3. It has denied to the great army of agriculturists of this state the inalienable right of liberty of contract with each other, in the organization and operation of a mutual telephone company, not. for profit, without obtaining the consent of the present telephone monopoly occupying the field, or the consent of the state Public Utilities Commission, a commission in whose choice they have no voice, a commission in which they are unrepresented save in the most academic way, a commission wholly irrespon *569 sible to them and over whose actions they have no appeal save through this court.
The ghoulish glee, in the words of a distinguished ex-president, with which the big corporate interests of the state will contemplate the victories they have won in this court over the millions of people in the cities, the millions of the great working world, and the million and more of farmer folks in this state, is, to say the least, a very doubtful compliment to this court.
There is just one controlling reason for the rendition of this unreasonable, unconstitutional judgment, which reverses the reasonable, constitutional judgment of the court of appeals, and that is that this judgment has the concurrences of just four judges.